ALLEN, Chief Judge.
The appellee, as plaintiff in the lower court, filed a complaint alleging that the appellant defendant was indebted to plaintiff in the amount of $4,970.32 for goods bargained and sold by the plaintiff to the defendant between February 6th and November 26, 1957. After defendant’s motion to dismiss was denied, the defendant filed an answer in the form of a general denial. A jury trial resulted in a verdict in favor of plaintiff for the amount claimed plus costs. After defendant’s motion for new trial was denied, final judgment in favor of plaintiff was entered.
The plaintiff, Major Appliances, Inc., is a wholesale distributor of appliances such as refrigerators, freezers, air conditioners, television sets, radios and washing machines. The defendant, Ingram’s Super Market, Inc., is a large grocery store. Ingram’s Appliances, Inc. is engaged in the retail sale of appliances and is located in the Ingram’s Super Market, Inc., building and in fact you have to go through the supermarket to get to the appliance section. Norman Ingram is president of the supermarket corporation and vice-president of the appliance corporation and is a director in both corporations.
The complaint in paragraph I alleged that the defendant owes the plaintiff the sum of *165 $4,970.32 “for goods bargained and sold” by the plaintiff to the defendant between February 6, 1957, and November 21, 1957, and attached thereto was a copy of the account covering this period. In paragraph II of the complaint it was alleged that the defendant was indebted to plaintiff in the amount of $4,970.32 for “goods sold and delivered”, during the period of time set forth in paragraph I, “as per account stated” between the plaintiff and the defendant.
The memorandum of the pretrial conference which appears in appellee’s appendix sets forth the theory under which the case was to be tried as follows:
“This case involves the liability of the defendant for certain items of personal property alleged to have been sold by the plaintiff to the defendant. Defendant denies buying the items in question, alleging that the same were sold to Ingram’s Appliances, Inc., rather than the defendant and that liability for the same is confined to Ingram’s Appliances, Inc. This is the issue to be tried.”
It therefore appears that the cause came on for trial on the issue of goods bargained and sold and account stated. The facts and conflicting testimony as appear in the record of the proceedings upon which the jury found for the plaintiff in brief are as follows:
During 1954-56 the plaintiff did business with Ingram’s Appliances but, after Ingram’s Appliances became delinquent in paying plaintiff for the merchandise, plaintiff notified Ingram’s Appliances, in December, 1956, that plaintiff would no longer sell appliances to it on credit. On December 26, 1956, plaintiff’s salesman, John Fox Greenwalt, Jr., went to the defendant’s property to collect for the delinquent appliance account and to discuss the possibility of re-establishing its line of credit with plaintiff. A1 Crosby, sales manager for Ingram’s Appliances, asked Greenwalt to ship him a freezer, whereupon Green-walt said that he couldn’t since the plaintiff had cut off all credit to Ingram’s Appliances, Inc. Greenwalt testified that Ingram then took him aside and' told him that he, Norman Ingram, had not been satisfied with the appliance store profit but that he would like to continue the food freezer plan. (The appliance store purchased home freezers from plaintiff and when sold to a customer, the food store sold a certain amount of groceries as part of the package deal.) Greenwalt further testified that at this meeting Ingram told him to have plaintiff charge the future freezer purchases to Ingram Super Market; that he immediately called plaintiff’s credit manager, Beebe, informing him of this new arrangement ; and that plaintiff’s ledger cards were changed so that all subsequent purchases were charged to Ingram’s Super Market, Inc.
From that time on, most of the appliances shipped by plaintiff to defendant were freezers. Although plaintiff’s ledger cards show the charges for these appliances were made to the account of Ingram’s Super Market, Inc., many of the invoices were sent out covering the same appliances in the name of Ingram’s Appliances, Inc. Plaintiff’s credit manager, Beebe, explained this oversight in the billing and shipping department as follows:
“A. We are a large corporation, I am in and out of the office, I set a credit line for any dealer as long as they are operating within their credit limits, even though I am out of the office, they can be approved. Most of the orders from Ingram’s were telephoned in to our office. In most of the cases they covered freezers for which they had sales at the time that they were shipped. We had two or three girls during this period of time that did the billing of the invoices, and the shipping, and in our place they were known as Ingram’s, so some of them got Ingram’s Appliance, and some of them have the correct name that I agreed to ship under, which was In *166 gram’s Super Market. But as far as I was concerned, I was dealing credit-wise with the super market only during this period, otherwise there would have been no shipments.”
On August 31, 1957, plaintiff sent defendant a statement of the balance due in the amount of $5,343.56. The defendant made no objection to this statement and on September 5, 1957, a payment of $1,331.72 was made by defendant and it was credited to the Ingram Super Market account. It is also noted that Gene Webb, a former employee and manager of Ingram’s Appliances, Inc., testified that Norman Ingram instructed him to make a payment to the plaintiff and two other creditors out of the proceeds of the sale of certain freezers because “I [Ingram] am responsible for them.” Webb also stated that Ingram told him the plaintiff would ship a freezer when ordered because the freezers were now being billed to the Super Market.
The payments which were made after the alleged change of purchaser came through an account styled Ingram’s Appliances, Inc., instead of from Ingram’s Super Market, Inc. This fact apparently was unknown to plaintiff’s credit manager at the time although certain testimony reflects that upon other occasions Norman Ingram had directed his appliance store manager to pay delinquent bills in the name of the appliance store, with Ingram’s personal funds. The plaintiff first became aware that the defendant disclaimed any liability for the account in question in the early part of 1958 when Norman Ingram, accompanied by his attorney, approached the plaintiff’s credit manager, Beebe, concerning some repossessions that were financed through Commercial Credit Corporation. Beebe informed Ingram that the plaintiff was looking solely to the defendant for full payment of the account and that he, Beebe, was not interested in any further dealings with Ingram or his corporations until the Ingram Super Market account was paid in full.
Norman Ingram testified that the sales during the period in question were actually made by plaintiff to Ingram’s Appliances, Inc.; that none of these sales were to Ingram’s Super Market, Inc.; that the alleged conversation of December 26, 1956, was simply a request by Greenwalt for Ingram to personally guarantee the appliance store’s account; and that he refused to extend this request for such guarantee. John Witt, a lifelong friend of Ingram - and a stockholder in Ingram’s Appliances, Inc., testified to essentially the same facts as did Ingram.
There is considerable other conflicting testimony and evidence in the record but further delineation herein would serve for naught except to unduly lengthen this opinion. The essence of this testimony was that plaintiff cut off the appliance store’s credit; that after the alleged agreement plaintiff began shipping appliances to defendant; and that although theoretically and legally the two Ingram corporations were separate and distinct entities, Ingram appeared to be the dominant factor in all of their business dealings.
As was pointed out previously, the complaint and the pretrial order showed that the case was to be tried on the issue of goods bargained and .sold and account stated. Moreover, in the court’s instructions to the jury, which were not objected to by the defendant, the theory of plaintiff was very lucidly explained as one for goods sold pursuant to either a written or oral agreement between the parties. The conflicting evidence was properly submitted to the jury for their reconciliation and it is within the function of the jury to give credibility to that which it deems believable and to reject that which it refuses to believe. 2 Fla.Jur. Appeals, sec. 342. We are not concerned with what an appellate court would have decided had they been on'the jury, but the test is whether or not this court can say, after viewing the case in a manner most favorable to the successful litigant, that the jury as reasonable men *167 could not have found the verdict that was entered. Merchants’ Transport Co. v. Daniel, 109 Fla. 496, 149 So. 401. After a careful review of the record in the instant case, we find that there was adequate evidence and testimony upon which the jury could have arrived at the conclusion reached in proceedings below.
We, therefore, hold that the factual dispute as to the liability of the defendant for the purchases in question was resolved under appropriate instructions by the trial judge and that the judgment of the lower court is hereby affirmed.
Affirmed.
KANNER and SHANNON, JJL concur.